**FOR PUBLICATION**

**Order Filed on November 4,
2016 by Clerk, U.S. Bankruptcy
Court - District of New Jersey**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In Re:<br><br>Roper and Twardowsky, LLC,<br><br>       Debtor. | Chapter 7<br><br>Case No.:  15-32878 (SLM)<br><br><br>Judge:  Hon. Stacey L. Meisel |

## <u>OPINION</u>

<u>A P P E A R A N C E S :</u>

Michael J. Connolly, Esq.
LeClairRyan P.C.
One Riverfront Plaza
1037 Raymond Boulevard
Sixteenth Floor
Newark, New Jersey 07102
***Counsel for Trustee, Charles M. Forman***

Jay Rice, Esq.
Nagel Rice, P.C.
103 Eisenhower Parkway
Roseland, New Jersey 07068
***Counsel for Bendit Weinstock P.A.***

Jerrold S. Kulback, Esq.
Archer & Greiner P.C.
One Liberty Place
Thirty-Second Floor

1650 Market Street
Philadelphia, Pennsylvania 19103
***Counsel for Gorman & Gorman, LLC***

Harry M. Gutfleish, Esq.
Goldman, Davis & Gutfleish, P.C.
Three University Plaza
Fourth Floor
Hackensack, New Jersey 07601
***Counsel for Goldman, Davis & Gutfleish, P.C.***

Morris S. Bauer, Esq.
Norris, Mclaughlin & Marcus, P.A.
721 Route 202-206, Suite 200
Bridgewater, New Jersey 08807
***Counsel for Angela Roper and Kenneth Thyne***

William J. Skepnek, Esq.
1 Westwood Road
Lawrence, Kansas 66044
***Pro Se***

Albert M. Belmont, Esq.
Bochetto & Lentz, P.C.
1230 Brace Road
Cherry Hill, New Jersey 08034
***Counsel for Bochetto & Lentz, P.C***.

**THE HONORABLE STACEY L. MEISEL, UNITED STATES BANKRUPTCY JUDGE**

Before the Court are two pending motions in the *In re Roper and Twardowsky, LLC*
bankruptcy case (Case No. 15-32878-SLM).[1]  The first motion is to *Approve Settlement with
Gorman & Gorman LLC Pursuant to Federal Rule of Bankruptcy Procedure 9019* (the "**Gorman
Settlement Motion**" or "**Gorman Settlement**").  (Docket No. 196).  The second motion is to
*Approve Settlement with Goldman Davis & Gutfleish, P.C. Pursuant to Federal Rule of
Bankruptcy Procedure 9019* (the "**Goldman Settlement Motion**" or "**Goldman Settlement**").
(Docket No. 204).  Collectively these motions will be referred to as the "**Settlement Motions**."
The Chapter 7 Trustee, Charles H. Forman (the "**Trustee**") filed both motions.  Any reference to
the "Trustee" means the Chapter 7 Trustee, unless stated otherwise.  The Court heard oral argument
on the Settlement Motions on August 16, 2016 (the "**August 16th Hearing**").

Bendit Weinstock, P.A. (the "**Bendit Firm**"), William J. Skepnek ("**Mr. Skepnek**") and
Steven M. Smoot ("**Mr. Smoot**") (collectively "**Skepnek & Smoot**"), Angela Roper ("**Ms.
Roper**") together with Kenneth Thyne ("**Mr. Thyne**") all filed either an objection or limited
objection to the Trustee's motions.  (Docket Nos. 225, 226, 227 and 237).  In response, Gorman
& Gorman LLC (the "**Gorman Firm**") and Goldman Davis & Gutfleish, P.C. (the "**Goldman
Firm**") filed responses in support of their respective settlements, while the Trustee filed a response
to the various objections.  (Docket Nos. 232, 236 and 237).  This prompted the Bendit Firm to file
a sur reply.  (Docket No. 246).

The Court also permitted Ms. Roper to file a five page fact-only declaration after the
August 16th Hearing since she was unable to accompany her counsel to the August 16th Hearing.
(Docket No. 251).  The Bendit Firm and the Gorman Firm alleged Ms. Roper's declaration

---

[1] Hereafter every reference to the docket pertains to Case No. 15-32878-SLM unless stated otherwise.

exceeded the scope of this Court's instruction, which prompted them to file another response to her declaration. (Docket Nos. 251 and 254). On September 20, 2016, this Court issued an oral decision which, among other things, classified Skepnek & Smoot's claim as unsecured and solely against the Debtor. The decision was memorialized by an Ordered entered on September 29, 2016. (Docket No. 292).

On September 30, 2016, this Court entered a Consent Order between the Trustee and the Bendit Firm wherein, among other things, the Bendit Firm withdrew its objections to both Settlement Motions. (Docket No. 293).

## JURISDICTION AND VENUE

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, the Standing Order of Reference from the United States District Court for the District of New Jersey dated July 23, 1984 and amended October 17, 2013. These matters concern the administration of the bankruptcy estate and relate to the allowance, disallowance and determination of claims against the estate. They constitute core proceedings pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B) and (O). Venue is proper under 28 U.S.C. §§ 1408 and 1409. The following shall constitute the Court's findings of fact and conclusions of law as required by Federal Rule of Bankruptcy Procedure 7052.

## PROCEDURAL HISTORY AND FACTUAL BACKGROUND

On December 4, 2015 ("**Petition Date**"), Roper & Twardowsky, LLC ("**Debtor**") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey. (Docket No. 1). The petition was signed by Ms. Roper as one of the principals of the Debtor. Mr. Thyne is also a principal of the Debtor.

At its core, the Debtor's bankruptcy case involves disputes over respective rights to settlement proceeds between the Debtor and a number of law firms that served as the Debtor's co-

counsel in a litigation against Prudential Life Insurance Company (the "**Prudential Litigation**"),

which was venued in the Superior Court of New Jersey ("**State Court**").

By Order of the Honorable Brian Martinotti ("**Judge Martinotti**"),[2] the funds from the

Prudential Litigation settlement were placed in the Roper & Twardowsky Qualified Settlement

Fund ("**QSF**").  Shortly after the QSF was established, the Prudential Litigation plaintiffs received

their settlements payments.  The remaining funds in the QSF were for attorney's fees and

administrative expenses, if any.  However, the Debtor disputed many of its former co-counsel's

attorney's fees in the State Court and the remaining disputes carried over into this bankruptcy case.

## I.      *Underlying State Court Action*

During the Prudential Litigation, the Debtor represented approximately 163 plaintiffs.  Like

many other large and complex litigations, the Debtor sought help in its representation of those

plaintiffs from various other law firms and attorneys throughout the United States.  During the

Prudential Litigation, the Debtor entered into various agreements with other law firms and

attorneys, including but not limited to, the Gorman Firm, the Goldman Firm, the Bendit Firm, the

Bochetto Firm[3] and attorneys Mr. Skepnek & Mr. Smoot to act as its co-counsel (collectively

referred to as the "**Law Firm Creditors**").  The Debtor, Ms. Roper in her various capacities, and

the Law Firm Creditors all generally disputed the amount of attorney's fees owed to each other.

Ms. Roper and the Law Firm Creditors all allege they are creditors of both the Debtor and the QSF

for legal services provided during the Prudential Litigation.

---

[2] At the inception of the Prudential Litigation, Judge Martinotti served on the State Court.  On July 11, 2016, Judge
Martinotti began serving as a District Court Judge for the United States District Court of New Jersey.  All references
in this opinion to any decision/actions by Judge Martinotti refer to the time when Judge Martinotti served as a Judge
for the State Court.
[3] This decision contains a very limited discussion about the Borchetta Firm since it neither raised an objection to the
Settlement Motions nor provided any comment at the August 16, 2016 hearing.

## II.    The Bendit Firm's Discharged Attorney's Lien

In August 2007, the Bendit Firm joined the Debtor as co-counsel in the Prudential Litigation. *See Rider to Proof of Claim of Bendit Weinstock, P.A.* (Claim Registry,[4] Proof of Claim No. 5 at 5).[5]

Between November 2010 and April 2011, many of the Debtor's clients agreed to settle with the Prudential Life Insurance Company (the "**First Settlement**"). *Id.* Subsequently, the clients who opted into the First Settlement were paid in full and associated counsel fees were disbursed to the Debtor and the Bendit Firm.[6] *Id.* At the same time, a number of Debtor's clients also chose to opt out of the First Settlement. *Id.* The Prudential Litigation continued with respect to those remaining plaintiffs.

Following the First Settlement, it appears that the Bendit Firm stopped serving as Debtor's co-counsel and performed no further services for the clients that opted out of the First Settlement. (Proof of Claim No. 5 at 5). On June 11, 2011, Judge Martinotti entered an Order relieving the Bendit Firm as the Debtor's co-counsel. *Id.* at 6. In that Order, Judge Martinotti addressed the Bendit Firm's right to further payment of fees in connection with the Prudential Litigation, which was still ongoing at the time. *Id.* Judge Martinotti held the value of the Bendit Firm's lien shall be determined at the time of the resolution of the Prudential Litigation and shall not exceed 16% of the amount previously offered to each plaintiff who opted out of the First Settlement plus costs. *Id.* 16% plus costs equated to approximately $2,011,562.85. *Id.*

---

[4] Hereafter every *Proof of Claim* is assumed to be filed with Claim Register belonging to this bankruptcy case unless stated otherwise.

[5] Docket entry page numbers refer to the original page number designated on the pleading and not the page numbers designated by the electronic filing system.

[6] It appears other firms also received payment as counsel from the First Settlement funds.

The Bendit Firm then filed an attorney's charging lien in the Prudential Litigation in the amount of $2,011,562.85.  The Debtor answered by challenging the Bendit Firm's attorney's charging lien.  At the August 16th Hearing, Trustee's counsel explained to the Court that Judge Martinotti discharged the Bendit Firm's lien and held that the Bendit Firm's compensation should be calculated based on *quantum meruit*.

### III.    *Mr. Skepnek and Mr. Smoot's Dismissed Attorney's Lien*

Skepnek & Smoot have their own relationship with the Debtor and its principals.  Skepnek & Smoot were initially co-counsel to the Debtor in the Prudential Litigation.  However, after a dispute arose, the Debtor ended its co-counsel relationship with Skepnek & Smoot.

After the First Settlement, Skepnek & Smoot filed a *Petition for Fees and Enforcement of Attorney's Charging Lien* in State Court.  The State Court dismissed Skepnek & Smoot's petition with prejudice, and denied Skepnek & Smoot's motion for reconsideration in September 2011.  (Proof of Claim No. 3 at 21).  Nevertheless, the State Court authorized Skepnek & Smoot to file an action against the Debtor for either a breach of contract or *quantum meruit* or any other non-lien basis.  *Id*.

Subsequently, Skepnek & Smoot filed suit against the Debtor in the United States District Court for the District of Kansas (Case No 11-CV-4102-DCC) based on breach of contract and *quantum meruit* (the "**Kansas Action**").  (Proof of Claim No. 3 at 21-22).  While the Kansas Action was pending, the Debtor filed a motion in State Court seeking to discharge the liens asserted by Skepnek & Smoot.  By Order dated December 6, 2013, the State Court held that Skepnek & Smoot did not have a lien or a claim on monies paid in the Prudential Litigation.  (Docket No. 240 at 5).

On October 16, 2015, Skepnek & Smoot obtained a judgment in the Kansas Action in the principal amount of $2,250,000. (Proof of Claim No. 3 at 7). Thereafter, Skepnek & Smoot returned to State Court requesting authorization to intervene in the ongoing fee disputes between the other law firms and the Debtor. Judge Martinotti granted Skepnek & Smoot's motion to intervene by Order dated November 20, 2015. *See Notice of Removal of Intervention to Bankruptcy Court*. (Adv. Pro. 16-01182, Docket No. 1-1 at 4).

## IV.    *The Gorman Firm's Co-Counsel Agreement*

The Gorman Firm entered the continuing saga after the First Settlement. Specifically, the Firm entered into a written tri-parte Agreement for Division of Attorney Fees with both the Debtor and the Bendit Firm (the "**Gorman Agreement**") in March 2011. *See Declaration of Angela Roper, Esquire* (the "**Roper Declaration**"). (Docket No. 251 at 5-7). The Gorman Agreement provides that the Gorman Firm will act as co-counsel to the Debtor in representing 27 plaintiffs in the Prudential Litigation. *Id*. In return for its services, the Gorman Firm will receive 30% of all attorney's fees paid by, or on behalf of, or relating to the 27 plaintiffs. *Id.* To this day, the Gorman Firm has not been paid for its services and estimates that it is owed $2,809,630.60 in legal fees. (Proof of Claim No. 4).

## V.    *The Goldman Firm's Agreements*

The Goldman Firm also entered into a written agreement with the Debtor in 2011 ("**Goldman Agreement**"). The Goldman Agreement provides that the Goldman Firm will be paid at a fixed rate on an hourly basis. *See Certification of Charles M. Forman, Chapter 7 Trustee, in Support of Motion to Approve Settlement with Goldman Davis & Gutfleish, P.C. Pursuant to Fed. R. Bankr. P. 9019*. (Docket No. 204-1 at 2-3).

8

The Goldman Firm, through its principal, Evan Goldman ("**Mr. Goldman**"), maintain that its role and involvement in the Prudential Litigation evolved beyond what the parties originally planned. *See Letter to Judge Meisel* (Docket No. 236). Thus, Mr. Goldman negotiated additional compensation with the Debtor's principal, Ms. Roper. *Id.* at 1-3. Under the modified terms, in addition to fees billed by the Goldman Firm at the rate of $450 per hour, the Goldman Firm would receive a fee enhancement of $350,000 ("**Modified Goldman Agreement**"). *Id.* At the end of the Prudential Litigation, the Goldman Firm calculated that it was owed $750,000 for its services. *Id.* at 2. The Modified Goldman Agreement was an oral agreement. However, as evidence of the arrangement, the Goldman Firm submitted to the Court a letter dated January 29, 2014 that was sent by Mr. Goldman to Ms. Roper and outlined the Modified Goldman Agreement. (Docket No. 236 at 4-7). It appears, the Goldman Firm never received a written response from the Debtor or its principals. Neither Ms. Roper nor Mr. Thyne objected to the amount or characterization of the fee arrangement described by the Goldman Firm.

## VI.    *2013 Prudential Litigation Settlement*

In May 2013, the remaining plaintiffs in the Prudential Litigation received an aggregate settlement offer. Thereafter, a mediator was assigned to allocate the settlement funds to the individual plaintiffs. It appears at some point, Judge Martinotti entered an Order requiring the various remaining law firms to file fee petitions or motions to assert attorney's charging liens. The Gorman Firm timely filed a *Notice of Attorney Lien* in the Prudential Litigation. The Goldman Firm asserts it filed a timely "informal" attorney charging lien against the QSF by virtue of certain correspondence advising the parties, on the one hand, and the Judge Martinotti, on the other, of its lien. None of the objections filed dispute the timeliness of the Gorman Firm's *Notice of Attorney Lien*.

In December 2013, the parties remaining in the Prudential Litigation finalized the settlement agreement. On December 20, 2013, Judge Martinotti entered an Order establishing the QSF. Following entry of the QSF Order, Prudential deposited the remaining settlement funds into the QSF.

Sometime thereafter, the plaintiffs in the Prudential Litigation began receiving their settlement amounts from the QSF, net attorney's fees and other costs. It is not clear to this Court when the last plaintiff received its payment out of the QSF. But on January 7, 2016, Ms. Roper (acting as the QSF Trustee) expressly advised Judge Martinotti that the "final distribution to a Prudential client was accomplished." *See Jay Rice's Certification in Support of Joint Motion to Terminate the Roper & Twardowsky QSF or Remove Angela Roper as Trustee* (Docket No. 77-2, Exhibit C). In the same correspondence, Ms. Roper told Judge Martinotti that "there is no need for the continuation of the Qualified Settlement Fund Trust." *Id*. In other words, the purpose of the QSF was fulfilled.

Notably, at the August 16th Hearing, the Court confirmed with the parties that a number of law firms who previously assisted in the Prudential Litigation already received payment from the QSF. Those payments were made prior to the bankruptcy case. At the time of the payments, all of the Law Firm Creditor's (minus Skepnek & Smoot because they were no longer parties to the case and instead were pursuing the Kansas Action) agreed to those other law firms receiving payment of fees and expenses from the QSF.

### A.    Debtor's State Court Challenge to the Gorman Firm's Attorney's Charging Lien

The Debtor challenged the Gorman Firm's efforts to enforce its attorney's charging lien in State Court. *See Certification of Charles M. Forman, Chapter 7 Trustee, in Support of Motion to Approve Settlement with Gorman & Gorman, LLC Pursuant to Fed. R. Bank. P. 9019*. (196-1 at

3-4).    The Debtor contended, *inter alia*, that: (1) the Gorman Firm breached the Gorman Agreement by requiring or otherwise causing additional law firms to perform work that it contracted the Gorman Firm to perform; (2) the Gorman Firm lost its rights under the Gorman Agreement by virtue of an Order in the State Court referencing that its representation of the plaintiff ceases as of December 30, 2013; (3) Scott Gorman ("**Mr. Gorman**"), a principal of the Gorman Firm, fraudulently induced the Debtor into the Gorman Agreement based upon representations as to the amount of recovery and the need for involvement of additional firms; and (4) Mr. Gorman made statements or representations during the course of settlement that reduced the ultimate settlement amount.  *Id*.  The Debtor further contended that due to the number of law firms ultimately involved in the Prudential Litigation, the Gorman Firm should be compensated on a *quantum meruit* basis, apportioning the division of the QSF funds in accordance with each firm's contribution to the case.  *Id*.

The State Court never adjudicated the Gorman Firm's attorney's charging lien because the Debtor filed bankruptcy.  Meaning, the Gorman Firm's attorney's charging lien existed on the Petition Date.

## VII.    *The Goldman Firm's Amount Due*

In 2014, the Debtor paid the Goldman Firm $350,000 for its services in connection with the Prudential Litigation.  The Goldman Firm maintains it is still owed a balance of $400,000.  (Proof of Claim No. 2).  As indicated, the Goldman Firm alleges it possess an attorney's charging lien on the QSF despite not having filed a formal fee petition or motion.  *Id*.

### VIII.   *Debtor's Bankruptcy*

#### A.      **Stay Relief**

As indicated, the Debtor filed bankruptcy on December 4, 2015.  On December 23, 2015, the Law Firm Creditors, excluding the Goldman Firm,[7] filed a *Joint Motion for Relief from the Automatic Stay*, with a request to be heard on shortened time.  (Docket No. 18).  The Law Firm Creditors requested this Court enter an order requiring that the funds held in the QSF be deposited into this Court; and/or replacing Ms. Roper as the Trustee of the QSF; or granting relief from the automatic stay pursuant to Section 362(d)(2) of the Bankruptcy Code to permit Judge Martinotti to grant such relief.  *Id.*

On January 5, 2016, this Court entered an Order Vacating Stay, which provided "relief from the automatic stay to prosecute one or more motions/applications in the action captioned *In re Prudential Life Insurance Company if America Tort Litigation*, … seeking one or more orders requiring that certain funds in the Roper Twardowsky Qualified Settlement Fund ("QSF") established pursuant to an order entered December 20, 2013 in the State Court Litigation be deposited into a Court, and/or replacing Angela Roper as the Trustee of the QSF."  (Docket No. 30 at 2) (emphasis in the original).

After receiving correspondence on the issue from Ms. Roper and the Law Firm Creditors, on January 11, 2016, Judge Martinotti entered a Civil Action Order, which ordered that the funds held in the QSF "shall be deposited with the Clerk of the Bankruptcy Court by noon on Thursday January 14, 2016."  (Docket No. 36 at 1-2).  The Order stated "any requests for disbursements

---

[7] The Goldman Firm does not join in any actions taken by the Law Firm Creditors in the bankruptcy case.  From this point forward, the use of the term Law Firm Creditors excludes the Goldman Firm.

shall be filed before the Honorable Stacey L. Meisel, U.S.B.J., with a copy sent to the Honorable Brian R. Martinotti." *Id.* at 7-8.

The Debtor timely deposited $7,790,526.04 from the QSF ("**QSF Funds**") with the Registry Fund of this Court. Pursuant to various Orders entered by this Court, the QSF Funds have already been used to pay certain fees and expenses.

### B.    Conversion to Chapter 7

On January 22, 2016, the Law Firm Creditors filed a *Joint Motion to Convert Bankruptcy Case to Chapter 7* ("**Conversion Order**"). (Docket No. 39). On February 23, 2016, following oral argument, the Court entered an *Order Converting the Case to Chapter 7*. (Docket No. 51). On February 29, 2016 Chapter 7 Trustee was appointed. (Docket No. 56). On March 8, 2016, the Debtor filed a *Motion to Dismiss the Chapter 7 Bankruptcy Petition or in the Alternative Reconsideration of the Bankruptcy Court Order Entered 23 February 2016 Converting Case from Chapter 11 to Chapter 7*. (Docket No. 63). At the Debtor's continued request, this Court has adjourned that motion

### C.    Law Firm's *Proof of Claims*

The Goldman Firm filed its *Proof of Claim* as a secured claim five (5) days prior to the Conversion Order on February 24, 2016 in the amount of $400,000. (Proof of Claim No. 2). Soon after, the Law Firm Creditors also filed claims. On April 8, 2016, Skepnek & Smoot filed their *Proof of Claim* as an unsecured claim in the amount of $2,259,594.63. (Proof of Claim No. 3). On April 19, 2016, the Gorman Firm filed a secured *Proof of Claim* in the amount of $2,809,630.60. (Proof of Claim No. 4). On June 9, 2016, the Bendit Firm filed a *Proof of Claim*[8]

---

[8] On October 11, 2016, the Bendit Firm filed *Bendit Weinstock, P.A.'s Motion to Amend Proof of Claim No. 5*. (Docket No. 298). The Bendit Firm requests that this Court allow it to amend its *Proof of Claim* to adjust its total claim to $5,611,562.80 – $2,011,562.82 payable out of the QSF and $3,600,000.00 treated as an unsecured claim against the Debtor. The motion is pending.

in the amount of $4,000,000[9] as an unsecured claim.  (Proof of Claim No. 5).  On June 15, 2016, the Bochetto Firm filed a *Proof of Claim* in the amount of $528,480.11 as a secured claim.  (Proof of Claim No. 7).

### D.    Notices of Removal

This case has been highly contentious on just about every issue, if not all of them.  Between February 22, 2016 and March 3, 2016, a number of the Law Firm Creditors filed a separate *Notice of Removal* to bring their attorney fee disputes into this bankruptcy case.  On February 22, 2016, the Gorman Firm filed a *Notice of Removal of Civil Claim to Bankruptcy Court*.  (Adv. Pro. No. 16-1143, Docket No. 1).  On February 25, 2016, the Bendit Firm filed a *Notice of Removal of Civil Claim to Bankruptcy Court*.  (Adv. Pro. No. 16-1150, Docket No. 1).  On March 1, 2016, the Bochetto Firm filed a *Notice of Removal of Civil Claim to Bankruptcy Court*.  (Adv. Pro. No. 16-1158, Docket No. 1).  Lastly, on March 3, 2016, the Skepnek & Smoot filed a *Notice of Removal of Intervention to Bankruptcy Court*.  (Adv. Pro. No. 16-1182, Docket No. 1).

Currently pending before this Court are Debtor's, Ms. Roper's and Mr. Thyne's various *Motions to Abstain and/or Remand*, which were filed in every adversary proceeding mentioned above.  (Adv. Pro. No. 1143, Docket No. 45; Adv. Pro. No. 1150, Docket No. 24; Adv. Pro. No. 1158, Docket No. 37; Adv. Pro. No. 1183, Docket No. 21).  These matters have been continuously adjourned for a variety of reasons, namely Ms. Roper and/or her team's unavailability.

### E.    Debtor's Amended Schedules

On May 13, 2016, six (6) months into the bankruptcy case and after a number of issues arose in the case, the Debtor amended its schedules ("**Amended Schedules**").  (Docket No. 112).

---

[9] On September 30, 2016.  The Court entered a Consent Order between the Bendit Firm and the Trustee agreed to and filed a Consent Order.  (Docket No. 293).  The Order set the maximum amount of the Bendit Firm's claim payable from the QSF Funds as $2,011,562.85 and, to the extent it is allowed, remaining portion of its claim as a general unsecured claim against the Debtor's estate.  *Id*. at 2.

The Amended Schedules differed from the original schedules. The Amended Schedules excluded most of the Law Firm Creditors and the Goldman Firm as creditors. Only Skepnek & Smoot remained on the Amended Schedules as unsecured creditors. *Id.* Ironically, the deletion of the Law Firm Creditors and the Goldman Firm occurred after most of them provided the Debtor with notice of their claim via a *Notice of Removal* and/or *Proof of Claim*. On the other hand, the Debtor added a number of new creditors and claims: (1) a $2,500,000 secured claim held by Ms. Roper for deferred compensation; (2) a $380,000 secured claim by Craig R. Roper ("**Mr. Roper**") for a "Loan;" (3) a $1,250,000 secured claim by Mr. Thyne for deferred compensation; (4) an "Unknown" secured claim by Roper & Thyne, LLC (the "**Roper & Thyne Firm**") for "costs, expenses and attorneys hours in connection with [the] Skepnek litigation, [the] Gold litigation and QSF;" and (5) a $664,500 general unsecured claim held by Mr. Roper for rent due from 2004 to 2014. (Docket No. 112 at 10-16).

While not included on the Amended Schedules, on the last day to file a claim, July 28, 2016, Ms. Roper filed a $25,000,000 secured claim on behalf of herself individually. (Proof of Claim No. 9). She also filed a $1,000,000 secured claim on behalf of the Roper & Thyne Firm. (Proof of Claim No. 10). On the same day, the Roper & Thyne Firm filed a $1,250,000 secured claim signed by Mr. Thyne. (Proof of Claim No. 11 at 4). Neither Ms. Roper nor the Roper & Thyne Firm's claims are supported by backup documentation.[10]

---

[10] This Court notes that these additional claims filed by the Debtor's insiders directly contravene at least one previous declaration by Ms. Roper filed with the Court asserting Skepnek & Smoot to be the Debtor's only creditor. *See e.g. Certification of Angela M. Roper, Esquire, in Support of Debtor's Motion to Dismiss Petition Pursuant to 707(a), or in the Alternative, for Reconsideration of the Court's Order to Convert Pursuant to Federal Rule of Bankruptcy Procedure 9023.* (Docket No. 63-1).

F.    **QSF Funds**

As the bankruptcy case moved forward, in deciding certain issues, the Court referred to the

$7,790,526.04 deposit into the Registry Fund as property of the estate.[11]  On May 11, 2016, in a

letter to all the parties involved in this bankruptcy case clarifying and amending its May 9, 2016

decision ("**May 11, 2016 Supplement**"), this Court elaborated that the Debtor is "entitled to all of

the [QSF] Funds for attorneys' fees and Debtor's co-counsel simply have claims against the

Debtor."  (Docket No. 103 at 3).  After multiple parties requested a clarification of the May 11,

2016 Supplement, this Court distributed another letter on May 19, 2016 providing clarification to

the quoted language from the May 11, 2016 Supplement.  (Docket No. 125).  This Court stated in

pertinent part:

> [t]his line of the May 11, 2016 Supplement shall be clarified to mean
> that the [QSF] Funds currently held by the Bankruptcy Court –
> which were formerly in the Qualified Settlement Fund – and the
> Debtor's right to such [QSF] Funds, are subject to valid liens, claims
> and encumbrances that a party has or is able to prove. As all parties
> are aware, the nature, extent, and validity of the claims of the "law
> firm creditors" were the subject of litigation in the State Court,
> which have been removed to the Bankruptcy Court in various
> adversary proceedings. Those adversary proceedings have not been
> fully adjudicated and the right to the [QSF] Funds and/or the
> amounts ultimately distributed to any party, including the Debtor,
> remains unresolved. The Court recognizes that all parties reserve
> their rights, if any.

(Docket No. 125 at 2).

On September 20, 2016, this Court entered an Order granting the Trustee's *Motion*

*Compelling Accounting of QSF Expenses and Directing Turnover of Residual Balance of QSF*

---

[11] During many of the proceedings before this Court, the various parties have repeatedly taken the position that the QSF Funds are not property of the estate and the Debtor is solely entitled to the residuary interest.  The issue as to whether the QSF Funds are property of the estate is not relevant to the Settlement Motions.  That particular issue has not been briefed and remains subject to future rulings, if necessary.

*Funds to the Estate* ("**September 20th Hearing**").  (Docket No. 249).  This Court's decision was

memorialized by an Order entered on September 29, 2016 ("**September 2016 Order**").[12]

### G.    The Gorman Settlement Motion

On July 22, 2016, the Trustee filed the Gorman Settlement Motion.  In short, the Trustee seeks

to reduce the Gorman Firm's claim from the $2,806,630.00 to $2,320,000.00 and to immediately

pay the settled amount from the QSF Funds.  The Trustee certifies in support of the Gorman

Settlement Motion that if this Court approves the Gorman Settlement, it will resolve both: (1)

Gorman's *Proof of Claim* in the amount of $2,809,630.60, and (2) Adversary Proceeding No. 16-

01143.  (Docket No. 196-1 at 1).

In this bankruptcy case, as in the State Court, the Gorman Firm asserts it holds a valid

attorney's charging lien against the QSF Funds.  The Gorman Firm also contends that it holds a

contractual claim against the Debtor by virtue of the Gorman Agreement.  (Docket No. 196-1 at

4).  In the alternative, the Gorman Firm maintains it holds a *quantum meruit* claim against the

Debtor, which exceeds the amount of its contractual claim.  *Id.*

In evaluating the Gorman Firm's claim, the Trustee certifies that:

> [d]uring the course of this case, [the Trustee's] counsel and
> [Trustee] have engaged in considerable investigation regarding the
> Gorman [Firm's] claims and the Debtor's objections. [They] have
> met and conferred on numerous occasions with the Debtor's
> principal and counsel. [They] also have met and or conferred on with
> Gorman [Firm's] principal and counsel. [They] have reviewed the
> pertinent pleadings and other evidence in the Prudential Litigation
> relating to the Gorman [Firm's] claim. [They] have met with the
> mediator in the Prudential Litigation who made numerous attempts
> to resolve the Gorman [Firm's]claim.

*Id.*

---

[12] It is unclear whether the Trustee has already obtained the QSF Funds or if the QSF Funds are still on deposit with
the Registry Fund of this Court.  However, the distinction is not crucial for the purposes of the Settlement Motions.

Those discussions between the Trustee and representatives of the Gorman Firm prompted a negotiated resolution. For this reason, the Trustee certifies that he "successfully negotiated a resolution with [the] Gorman [Firm]." *Id*. at 5. The settlement is structured as follows:

> [t]he pertinent terms of the proposed settlement are: (a) [the] Gorman [Firm] will be paid a legal fee of $2,320,000.00 out of the funds transferred by the QSF Trustee to this Court (which transfer was pursuant to the Orders of this Court and the State Court in January 2016) in full and final satisfaction of any and all claims of [the] Gorman [Firm] against the Debtor, as well as, any and all claims for any and all professional service rendered by the Gorman [Firm] in the Prudential Litigation, with said payment being made as soon as this Settlement is approved by this Court and (b) [the] Gorman [Firm] and the Trustee will provide to one another a General Mutual Release.[13]

*Id*.

The Trustee further certifies that he "weighed [the] merits of the claims and objections asserted, the potential litigation costs and [he] believe[s] that approval of this settlement would be in the best interest of the estate." *Id*. Specifically, the Trustee asserts, continued litigation with the Gorman Firm presents numerous factual disputes and open issues of law concerning procedure and jurisdiction. *Id*. In conducting his due diligence, the Trustee, advised this Court at oral argument that the Gorman Firm submitted detailed evidence of over 6,700 logged hours working on the Prudential Litigation, which the Trustee believes shatters any notion that the Gorman Firm would not receive a significant recovery if the case proceeded to trial. The Trustee believes this type of case guarantees a prolonged and expensive litigation with no certain conclusion should this court decline to approve the Gorman Settlement. (Docket No. 196-1 at 5). The Trustee also points out the Gorman Settlement will result in a substantial reduction of approximately $500,000

---

[13] Hereafter the General Mutual Release provided for in the Gorman Settlement will be referred to as the "**Mutual Release**."

claimed against the Debtor and the QSF while simultaneously avoiding unnecessary litigation costs. *Id*. at 6.

The Trustee supports the need for Mutual Release because the Gorman Firm requires it as part of the settlement. At the August 16th Hearing, the Gorman Firm, thought its counsel, reiterated the importance of the Mutual Release and elaborated that it would not enter into a settlement without it. While the Trustee acknowledges the release is an atypical release, he notes that it does not unfairly prejudice the rights of any known third parties. *Id*.

     1. <u>Mr. Roper and Ms. Thyne's Objection to Gorman Settlement</u>

On August 9, 2016, Ms. Roper and Mr. Thyne filed a *Limited Objection to Trustee's Motion to Approve Settlement with Goldman Davis & Gutfleish, P.C. and Limited Objection to Trustee's Motion to Approve a Settlement with Gorman and Gorman, LLC* (the "**Roper Objection**"). (Docket No. 227). Additionally, after the August 16th Hearing, Ms. Roper filed the Roper Declaration in support of her limited objections to the Settlement Motions. (Docket No. 251).

Ms. Roper and Mr. Thyne are former principals of the Debtor. They object to the Gorman Settlement Motion on the basis that: (1) that the Gorman Firm is not a creditor of the bankruptcy estate; (2) no Mutual Release should be given, but if it is, it should be reworded; and (3) no settlement funds should be paid to the Gorman Firm until all claims against the QSF are resolved. (Docket No. 227 at 3-5). Neither Ms. Roper nor Mr. Thyne object to the amount of the Gorman Settlement. *Id*.

According to Ms. Roper and Mr. Thyne, the Gorman Firm is not a creditor of the estate, but rather only filed a *Proof of Claim* in the amount of $2,809,630.60 as a protective measure until it received a distribution from the QSF for its rendered services. *Id*. at 4. They further assert

that the Gorman Firm's only claim against the Debtor is for sanctions arising from the Debtor

having opposed the Gorman Firm's attorney's charging lien claim against the QSF.[14]  *Id.*

Further at odds with the argument that the Gorman Firm possess no claim against the

Debtor – Ms. Roper asserts that Judge Martinotti entered an Order[15] on December 30, 2013 that

relived the Gorman Firm as co-counsel.  (Docket No. 251 at 1).  Ms. Roper indicates this Order,

according to "case law," would limit the Gorman Firm's claim to *quantum meruit*.  (Docket No.

251 at 1).

Ms. Roper and Mr. Thyne's also object to the language in the Mutual Release included

with the Gorman Firm's Settlement.  Specifically:

> [a]s Ms. Roper and Mr. Thyne understand this settlement, their
> respective individual claims against the Gorman firm are not being
> released. The General Mutual Release uses the words 'or otherwise'
> in Section l(a), 'or otherwise' in Section l(b), 'seeking
> indemnification' in two places in Section I(d) and includes a 'one
> way' provision set forth in 2(c), entitled 'Third Party Beneficiaries.'
> Ms. Roper and Mr. Thyne are concerned that the insertion of these
> words and provisions are being used in an effort to cut-off their
> personal claims against the Gorman firm and the referenced
> 'parents, subsidiaries, agents, affiliates ... , heirs, successors and
> assigns'. A global release was requested of Ms. Roper and Mr.
> Thyne in their individual capacity, which Ms. Roper and Mr. Thyne
> would not agree to.

(Docket No. 227 at 4, Footnote 2).  Therefore, Ms. Roper and Mr. Thyne submit that no release

should be signed even though the Mutual Release is between the Trustee and the Gorman Firm.

Ms. Roper and Mr. Thyne's third and last contention is that New Jersey law, by way of

*Martin v. Martin*, 335 N.J. Super. 212 (2000), prevents the distribution of monies out of the QSF

---

[14] Ms. Roper and Mr. Thyne assert the Gorman Firm may have a claim for sanctions. Yet, as previously stated, the
Amended Schedules fail to list the Gorman Firm as a creditor despite: (1) having listed it on the original schedules;
and (2) apparent knowledge of Gorman Firm's potential claim for sanctions.

[15] Copy of the December 30, 2013 Order is attached to the Roper Declaration as Exhibit C.  (Docket No. 251 at 14-
15).

Funds to the Gorman Firm without payment being made at the same time to all other attorneys with claims. (Docket No. 227 at 5). Ms. Roper and Mr. Thyne assert that *Martin v. Martin* provides that where there are successive or multiple attorneys, each having represented the same client, and only a limited pool of assets – that may be insufficient to satisfy all the fees that may be reasonably assessed – each attorney stands on equal footing. Therefore, a *pro rata* distribution is appropriate after a determination as to the amount that is properly owed to each counsel. *Id.* In other words, Ms. Roper and Mr. Thyne assert the Gorman Firm should not be paid until all the other claims to the QSF Funds are determined and paid. Then, the Gorman Firm should share in the distribution on a *pro rata* basis and at the same time as all other remaining creditors.

### 2.    The Trustee's Response to the Roper Objection

On August 15, 2016, the Trustee filed the *Trustee's Response To Objections To Motions To Approve Settlements with Goldman Davis & Gutfleish, P.C. and Gorman & Gorman, LLC* ("**Trustee's Response**"). (Docket No. 240). The Trustee asserts Ms. Roper and Mr. Thyne's allegations are "without merit." (Docket No. 240 at 12). A review of the Gorman Firm's *Proof of Claim* facially demonstrates its intent to be a creditor of the Debtor. *Id.* The Trustee states "[t]he Gorman Proof of Claim specifically states that its claim is based on a written contract with the Debtor that is in addition to its quantum meruit claim and statutory attorneys' lien claim." *Id.* (internal quotations omitted).

In regards to the Mutual Release, the Trustee again maintains that he is not aware of any facts or circumstances whereby the execution of the Mutual Release would unfairly prejudice the rights of any third-parties. (Docket No. 240 at 12-13). Likewise, the Trustee asserts Ms. Roper and Mr. Thyne's objection to the Mutual Release failed to show that third-parties will be unfairly prejudiced in any way. *Id.* Additionally, at the August 16th Hearing, the Trustee shared with the

21

Court that the Mutual Release language that was requested and negotiated at length with the Gorman Firm.  The Trustee further explained that the Gorman Firm made it clear to him that it was not going to agree to any settlement if it did contain a Mutual Release.

Lastly, the Trustee maintains that Ms. Roper and Mr. Thyne have no grounds to object to immediate payout of the settlement.  (Docket No. 240 at 13).  The Trustee asserts that an immediate settlement in no way prejudices Ms. Roper and Mr. Thyne because they are only entitled to distribution if money remains in the estate after all of the Debtor's creditors receive payment.  *Id*.

3.    The Gorman Firm's Response to the Roper Objection

On August 12, 2016, counsel for the Gorman Firm filed *Memorandum of Law in Support of Reply of Gorman & Gorman, LLC in Support of the Trustee's Motion to Approve Settlement*.  (Docket No. 232).

The Gorman Firm highlighted that no party took issue with the settlement amount and their objection are unjustified.  The Gorman Firm stated:

> [p]erhaps unhappy that they were unable to settle, the various objectors – some of whom have stood on the same side of the aisle with Gorman until this point – have filed objections. Not surprisingly, each of these objectors takes no issue with the $500,000 discount Gorman has offered. However, each argues that no settlement funds should be disbursed from the Funds on deposit with the Bankruptcy Court until all competing claims are resolved, which may be months or years away – essentially, the objectors 'want their cake and to eat it too.'

(Docket No. 232 at 2).  Moreover, the Gorman Firm stressed that "without immediate disbursement, Gorman will not agree to the discount, and there is no settlement."  *Id*. (emphasis in the original).

The Gorman Firm asserts that the Court should permit for immediate disbursement because all of the objecting parties' arguments are based on false assumptions. (Docket No. 232 at 3). According to the Gorman Firm, the false assumptions are "(i) that each claimant stands on equal footing with respect to the [QSF] Funds on deposit with the Bankruptcy Court; and (ii) that [QSF] Funds on deposit with the Bankruptcy Court are insufficient to pay all valid claims and therefore *pro rata* distribution is necessary." *Id.*

The Gorman Firm asserts that it has a valid attorney's charging lien on the QSF Funds and thus, compared to the other creditors, it holds a superior claim to the QSF Funds. *Id.* at 4-6. It cites to a number of New Jersey cases that reference and apply the relevant attorney's charging lien statute, N.J.S.A. 2A:13-5.[16] (Docket No. 232 at 3-5). Based on New Jersey law, the Gorman Firm indicates that its attorney's charging lien immediately attached after its first appearance in the Prudential Litigation in 2011. *Id.* Thereafter, the Gorman Firm asserts that it complied with Judge Martinotti's Order and the mechanics dictated by New Jersey law to perfect its attorney's charging lien on the QSF Funds. *Id.*

The Gorman Firm maintains *Martin v. Martin* is not applicable here. It asserts that in *Martin v. Martin*, all of the law firms possessed an attorney's charging lien. *Id.* at 7. The Gorman Firm contends this case is distinguishable from *Martin v. Martin* since only the Gorman Firm possess an attorney's charging lien. *Id.* In other words, the creditors in this case possess different levels of priority.

Next, the Gorman Firm asserts the Mutual Release language is absolutely necessary. It intended to protect the Gorman Firm and all related individuals from any possibility of future "frivolous" litigation brought by Ms. Roper, Debtor, or their affiliates. (Docket No. 232 at 12).

---

[16] N.J.S.A. 2A:13-5 is cited in full below. *See infra* p. 34.

At the August 16th Hearing, the Gorman Firm's counsel explained his client's concern is based on a prior incident, wherein the Debtor filed litigation against the Gorman Firm and related individuals, in their individual capacity, which the Debtor withdrew soon thereafter and never refiled.  Counsel further referenced Ms. Roper's proclivity for filing suits against attorneys and mentioned other instances of the same.  *Id.*

Based upon Ms. Roper's known litigious history, the Gorman Firm's counsel believed the lack of a Mutual Release could expose him, his firm, and his client to potential future litigation.  *Id.*  To prevent this, the Gorman Firm specifically negotiated the terms of the Mutual Releases.  *Id.*  In fact, the Gorman Firm indicates that it "would not have agreed to such a substantial reduction in the amount owed by the Debtor, absent the full scope of the release negotiated to include all of Gorman's employees, affiliates, etc."  (Docket No. 232 at 13).

Lastly, on August 17, 2017 the Gorman Firm responded to the Roper Declaration via a letter to the Court.  (Docket No. 254).  In its response, the Gorman Firm states it is a creditor of the Debtor.  The very same December 30, 2013 Order by Judge Martinotti that relieved it as counsel also, at the very least, preserved a contract claim against the Debtor.  (Docket No. 254 at 1).  The Gorman Firm asserts the same Order strengthens the Gorman Firm's attorney's charging lien argument.

The December 30, 2013 Order states:

> [t]he defendants may transfer settlement funds to the QSF
> (Qualified Settlement Fund) previously established by prior order
> of this Court, notwithstanding any lien asserted by counsel for any
> plaintiff, which lien shall be preserved for later adjudication.

*Id.* at 2.  The Gorman Firm asserts the above quoted passage means the "QSF was simply the vehicle to hold and disburse the funds, and not to invalidate or annul statutory liens."  *Id.*

4.    Skepnek & Smoot's Objection to the Gorman Settlement

On August 12, 2016, Skepnek & Smoot filed a *Motion to Compel Trustee to Abandon Appeal or in the Alternative Objection to Funding of the Proposed Gorman and Goldman Settlements*.  (Docket No. 237).  Skepnek & Smoot's request this Court refrain from releasing the Gorman Settlement amount until such time as the Court and the remaining Law Firm Creditors are provided with adequate assurances that the remaining assets of Debtor's estate will be sufficient to pay all the claims fairly.  (Docket No. 237-2 at 6-7).  In their written objection, Skepnek & Smoot were not clear about the basis for their objection or why they would be prejudiced by an immediate distribution of monies from the QSF Funds.

At the August 16th Hearing, Mr. Skepnek, spoke on behalf of himself and Mr. Smoot.  He explained that they interpreted Judge Martinotti's Order granting leave to intervene to provide Skepnek & Smoot with an equal priority claim to the QSF Funds.  In essence, Skepnek & Smoot argued that they have the same claim to the QSF Funds as the remaining Law Firm Creditors, notwithstanding Judge Martinotti's previous denials of Skepnek & Smoot's lien.  Skepnek & Smoot contend immediate distribution prejudices them because it may hurt their chances of collecting on their claim.  At the August 16th Hearing, Mr. Skepnek suggested to the Court that the parties were unaware of the Gorman Firm's attorney's charging lien argument and needed an opportunity to research and brief the issue.[17]

On September 29, 2016, the Court entered the September 29th Order that memorialized an oral decision on a separate matter which, *inter alia*, held Skepnek & Smoot do not have a claim against the QSF.  (Docket No. 292).  Rather, Skepnek & Smoot possess a claim against the

---

[17] Notably, on July 29, 2016, the Law Firm Creditors, including Mr. Skepnek, participated in a lengthy telephonic status conference with this Court where, among other things, the attorney's charging lien issue was discussed at length.

bankruptcy estate.  *Id*. Ergo, Skepnek & Smoot's objections to the Gorman Firm's Settlement

Motion are moot as a result of the September 29th Order.[18]

### 5.    The LaGrotta Letter

On August 8, 2016, LaGrotta Law, LLC ("**LaGrotta**"), submitted a letter ("**LaGrotta**

**Letter**").  (Docket No. 228) to the Court purporting to represent several of the Debtor's clients

who are beneficiaries of the QSF.  The LaGrotta Letter was filed by a non-party/participant in the

case, Robyne D. LaGrotta, Esq ("**Ms. LaGrotta**").  This Court references Ms. LaGrotta's letter

for purposes of completion, but otherwise has found little meaning in it, especially since Ms.

LaGrotta failed to ever appear before this Court to explain and support the letter.

The LaGrotta Letter reads as follows:

> Dear Judge Meisel:
>
> I represent several of the Roper clients who are the beneficiaries of the Roper & Twardowsky Qualified Settlement Fund Trust (hereinafter known as QSF).
>
> It has come to my clients attention that their former co-counsel and other attorneys with whom the QSF beneficiaries have no legal relationship have taken steps to remove Ms. Roper as the Trustee.  The clients that I currently represent oppose and vehemently object to the removal of Angela M. Roper as the Trustee.  Ms. Roper has represented these clients, some as early as 2002, and has remained the constant in representation of these clients for over 13 years.  My clients have advised me to state unequivocally that they do not TRUST any Plaintiffs' counsel who have been involved in handling of their case, other than Ms. Roper.
>
> I write to further advise that my clients have retained this office to commence litigation against Scott Gorman and others for the breach of their fiduciary duty and other related conduct and object to the release of any monies to Scott Gorman.  As the Court is aware, the entitlement to legal fees in this case is a result of a fee agreement with the clients.  In accordance with the RPC's and New Jersey Law, my clients have the right and hereby do exercise their objection to the release of any funds.
>
> Further, we place this Court and all counsel on notice that in the event there are any negative repercussions as a result of actions being taken in the U.S. Bankruptcy Court which impact upon the QSF and my clients' individual settlements, my clients will seek all available remedies, including damages and penalties.

(Docket No. 228 at 1-2).

---

[18] Skepnek & Smoot raised the same general arguments in objecting to the Goldman Settlement Motion.  (Docket No. 237).  Correspondingly, those arguments are now moot as well.

6.    Trustee's Response to the LaGrotta Letter

The Trustee rejects the claims made by Ms. LaGrotta.  First, the Trustee highlights that the Prudential Litigation plaintiffs have been paid in full.  (Docket No. 240 at 10-11).  Meaning, the QSF funds deposited with the Court represent a fund for payment of legal fees and expenses owed to the lawyers and law firms involved in the Prudential Litigation.  *Id*. at 11.  Further, the Trustee indicates that the "unnamed clients [through their counsel Ms. LaGrotta] fail to present any facts or law demonstrating that they have the right to object to a release of funds to the Gorman [Firm] or even the basis of any such objection" and all of the plaintiffs represented by the Gorman Firm signed "Approval and Consent" forms agreeing to the division of legal fees to which they now wish to object.  *Id*.

7.    Gorman Response to the LaGrotta Letter

The Gorman Firm categorizes the LaGrotta Letter as a "threat to the parties and to the Court" and asks the Court to ignore the letter.  (Docket No. 232 at 2, footnote. 2).  The Gorman Firm agrees with the Trustee's Response that the LaGrotta Letter set forth "bare assertions of breach of fiduciary duty" by the Gorman Firm and others while citing to no law or facts to back up its assertions.  *Id*.  Further, the Gorman Firm maintains that all "27 of Gorman [Firm's] former clients also consented, in writing, to the fees to be paid to Gorman pursuant to the Agreement for Division of Attorney Fees signed by the Debtor and Gorman in March 2011."  *Id*.

**H.    The Goldman Settlement Motion**

On July 26, 2016, the Trustee filed the Goldman Settlement Motion.  The Trustee asserts approval of the Goldman Settlement will resolve: (A) Goldman Firm's *Proof of Claim* in the amount of $400,000; and (B) any and all claims that Goldman Firm may have for professional services in an action commenced in State Court.  (Docket No. 204 at 1).

In respect to Goldman Firm's claim the Trustee certified that:

> [d]uring the course of this case, [his] counsel and [he] have engaged
> in considerable investigation regarding the Goldman [Firm] claims
> and the Debtor's objections. [They] have met and conferred on
> numerous occasions with the Debtor's principal and counsel. [They]
> also have met and or conferred on with the Goldman [Firm']
> principal and counsel. [They] have reviewed the pertinent pleadings
> and other evidence in the Prudential Litigation relating to the
> Goldman [Firm's] claim. [They] have met with the mediator in the
> Prudential Litigation who made numerous attempts to resolve the
> Goldman [Firm] claim.

*Id*. at 4.

Those discussions prompted a negotiated resolution.  For this reason, the Trustee certifies that

he:

> successfully negotiated a resolution with [the] Goldman [Firm]. The
> pertinent terms of the proposed settlement are that [the] Goldman
> [Firm] will be paid a legal fee of $180,000 out of the funds
> transferred by the QSF Trustee to this Court (which transfer was
> pursuant to the Orders of this Court and the State Court in January
> 2016) in full and final satisfaction of any and all claims of the
> Goldman [Firm] against the Debtor, as well as, any and all claims
> for any and all professional service rendered by the Goldman [Firm]
> in the Prudential Litigation, with said payment being made as soon
> as this Settlement is approved by this Court.

(Docket No. 204 at 5)

The Trustee certified that he "weighed [the] merits of the claims and objections asserted,

the potential litigation costs and believe[s] that approval of this settlement would be in the best

interest of the estate." *Id*. at 4.  Similarly to the Gorman Firm matter, this case presents numerous

factual disputes and open issues of law concerning procedure and jurisdiction.  Likewise, this type

of legal backdrop will almost guarantee a prolonged and expensive litigation with no certain

conclusion.  *Id*.

Trustee also points out the Goldman Settlement will result in a substantial reduction of approximately $220,000 claimed against the Debtor and the QSF while simultaneously avoiding unnecessary litigation costs. *Id*. at 6.

        1.        <u>Ms. Roper and Mr. Thyne's Objection to Goldman Settlement</u>

Ms. Roper and Mr. Thyne object to the Goldman Settlement Motion on the basis that (1) the Goldman Firm is not a creditor of the bankruptcy estate and (2) that the QSF Funds should not be made available to the Goldman Firm until all claims against the QSF are resolved. (Docket No. 227 at 2-3). Neither Ms. Roper nor Mr. Thyne object to the amount of the Goldman Settlement.

First, Ms. Roper and Mr. Thyne assert the Goldman Firm is not a creditor of the estate. Rather, the Goldman Firm filed a *Proof of Claim* in the amount of $400,000 as a protective measure until it received a distribution from the QSF for its services rendered in the Prudential Litigation. *Id*. at 2.

Second, Ms. Roper and Mr. Thyne assert *Martin v. Martin*, (as it did with respect to the Gorman Firm), prevents the distribution of monies out of the QSF Funds to the Goldman Firm without payment to all other attorneys with claims at the same time. *Id*. at 3.

        2.        <u>The Trustee's Response to the Roper Objection</u>

In response to Ms. Roper and Mr. Thyne's objections, the Trustee contends the Goldman Firm's *Proof of Claim* is filed against the estate in the amount of $400,000. (Docket No. 240 at 12). Moreover, the Goldman Firm's *Proof of Claim* specifically asserts claims against the Debtor's estate. The *Proof of Claim* states:

> [b]y filing this proof of claim, GDG does not waive or relinquish (a) any rights that it holds, or may be authorized to enforce, against the Debtor or against any other person....

(Proof of Claim No. 2 at 4).

## DISCUSSION

### I.    *Legal Standard*

Federal Rule of Bankruptcy Procedure 9019 governs the approval of settlement agreements.  Specifically, Rule 9019(a) provides "on motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  Fed. R. Bankr. P. 9019(a).

The decision to approve the settlement "lies within the sound discretion of the Bankruptcy Court."  *In re Petersburg Regency LLC*, 540 B.R. 508, 535 (Bankr. D.N.J. 2015) (quoting *In re Still*, 444 B.R. 520, 523 (Bankr. E.D.Pa .2010)).  The "unique nature of the bankruptcy process means that judges must carefully examine settlements before approving them."  *In re Nutraquest, Inc.*, 434 F.3d 639, 644 (3d Cir. 2006).

Notwithstanding, a court's discretion is limited and a proposed settlement cannot be piecemealed:

> a court cannot sustain an objection to the settlement while granting the motion to approve the settlement. *See generally ReGen Capital III, Inc. v. Oficial Comm. of Unsecured Creditors (In re Trism, Inc.),* 282 B.R. 662, 666–68 (B.A.P. 8th Cir.2002). 'In so doing, the court changes the essential terms of the proposed settlement and violates the purpose and spirit of Federal Rule of Bankruptcy Procedure 9019 or decides issues not necessary....' *Id.* at 667. Instead, the court's limited role is to determine whether the settlement should be approved or disapproved as proposed. *See generally id.* at 662.

*In re McDermott*, 2008 WL 877964, at *5 (Bankr. D.N.J. Mar. 27, 2008).

In approving a proposed settlement, a bankruptcy court must determine whether a settlement is "fair and equitable" and in the "best interests of the estate." *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 136 (Bankr. D.N.J. 2010) (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424, 88 S.Ct. 1157, 1163 (1968)).

Furthermore, "[i]n determining whether to approve the trustee's application to settle a controversy, the Bankruptcy Court does not substitute its judgment for that of the trustee." *In re Neshaminy Office Bldg. Assocs.*, 62 B.R. 798, 804 (E.D. Pa. 1986) (citing *In re Carla Leather, Inc.*, 44 B.R. 457, 465 (Bankr. S.D.N.Y. 1984), *aff'd*, 50 B.R. 764 (S.D.N.Y. 1985)). "Nor is the court 'to decide the numerous questions of law and fact raised by [objections] but rather to canvass the issues to see whether the settlement fall[s] below the lowest point in the range of reasonableness.'" *Neshaminy Office Bldg. Assocs.*, 62 B.R. at 80 (quoting *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983), *cert. denied sub nom., Cosoff v. Rodman*, 464 U.S. 822, 104 S.Ct. 89 (1983)).

Here, the Roper Objection requests that this Court alter the language of the Mutual Release. As stated, Courts may not change the parties' agreement. *See McDermott,* 2008 WL 877964, at *5. As such, this Court will not make an alteration to the Mutual Release language a condition of the settlement.

### A.    Third Circuit Factors for Approval of Proposed Settlements

The Third Circuit established four factors that courts should consider in determining whether to approve a settlement:

> (1) the probability of success in litigation; (2) the likely difficulties of collection; (3) the complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors.

*In re Martin,* 91 F.3d 389, 393 (3d Cir. 1996) (citing *Neshaminy Office Bldg. Assocs.*, 62 B.R. at 803).

Regarding the fourth factor articulated in *Martin*, courts must consider the effect of the settlement on all parties to the proceeding – the entire creditor body – and not individual creditor

interests.  *In re Biolitec, Inc.,* 528 B.R. 261, 270 (Bankr. D.N.J. 2014) (citing *In re Buffet Partners,*

*L.P.*, 2014 WL 3735804 at *2 (Bankr. N.D. Tex. July 28, 2014)).

### B.       Burden of Proof

It is the movant's burden to show that a proposed settlement is in the best interests of the

estate and the debtor.  *McDermott*, 2008 WL 877964, at *4 (citing *Neshaminy Office Bldg. Assocs.*,

62 B.R. at 804).   Moreover, the "proponent of the settlement has the burden of proving its

reasonableness and courts must take into consideration 'the fairness of the settlement to the other

persons, i.e., the parties who did not settle.'"  *Biolitec, Inc.,* 528 B.R. at 267 (citing *TCI 2 Holdings,*

*LLC*, 428 B.R. at 136)).

Further, in assessing the best interest to the debtor, "the Court must look to the

consideration for settlement.  This analysis pits the value of rights relinquished by the [estate]

versus the value received in return." *McDermott,* 2008 WL 877964, at *4 (citing *Neshaminy Office*

*Bldg. Assocs.*, 62 B.R. at 802).  When conducting the settlement analysis, the court is permitted to

take judicial notice of the record in prior related proceedings, and draw reasonable inferences

therefrom.  *In re Summit Metals, Inc*., 477 F. App'x 18, 21 (3d Cir. 2012).

### II.      *Gorman Settlement Motion Satisfies the Martin Standard*

### A.       The Gorman Firm's Attorney's Charging Lien on the QSF Funds

To start, the Gorman Firm has an attorney's charging lien on the QSF Funds.   The

objectors, on their face, do not.  This elevates the Gorman Firm's status to a higher level of

payment than the objecting creditors.  Simply, a lienholder creditor is paid before other creditors.

The Supreme Court in *Butner v. United States*, held:

> [p]roperty interests are created and defined by state law. Unless
> some federal interest requires a different result, there is no reason
> why such interests should be analyzed differently simply because an
> interested party is involved in a bankruptcy proceeding. Uniform

32

> treatment of property interests by both state and federal courts
> within a State serves to reduce uncertainty, to discourage forum
> shopping, and to prevent a party from receiving 'a windfall merely
> by reason of the happenstance of bankruptcy.'

440 U.S. 48, 55, 99 S. Ct. 914, 918 (1979) (citing *Lewis v. Manufacturers National Bank*, 364 U.S.

603, 609, 81 S.Ct. 347, 350 (1961)).   Although the Bankruptcy Code has since superseded the

Bankruptcy Act, under which *Butner* was decided, the proposition set forth in *Butner* remains at

the heart of the current federal bankruptcy framework.   *See Travelers Cas. & Sur. Co. v. Pac. Gas*

*& Elec. Co*., 549 U.S. 443, 127 S. Ct. 1199 (2007).

New Jersey common law has "long provided attorneys with a charging lien to secure

payment for services performed in connection with a suit or cause of action, whenever such action

resulted in a judgment in the client's favor."   *In re Rabinowitz*, 2011 WL 6749068, at *10 (Bankr.

D.N.J. Dec. 21, 2011) (citing *Visconti v. M.E.M. Machinery Corp.*, 7 N.J. Super. 271, 275 (App.

Div. 1950).   New Jersey has codified and expanded the common law attorneys' charging lien:

> [a]fter the filing of a complaint or third-party complaint or the
> service of a pleading containing a counterclaim or cross-claim, the
> attorney or counselor at law, who shall appear in the cause for the
> party instituting the action or maintaining the third-party claim or
> counterclaim or cross-claim, shall have a lien for compensation,
> upon his client's action, cause of action, claim or counterclaim or
> cross-claim, which shall contain and attach to a verdict, report,
> decision, award, judgment or final order in his client's favor, and the
> proceeds thereof in whose hands they may come. The lien shall not
> be affected by any settlement between the parties before or after
> judgment or final order, nor by the entry of satisfaction or
> cancellation of a judgment on the record. The court in which the
> action or other proceeding is pending, upon the petition of the
> attorney or counselor at law, may determine and enforce the lien.

N.J.S.A. 2A:13-5.   Under N.J.S.A. 2A:13-5, the attorney's charging lien is created at the

commencement of legal services.   *See* N.J.S.A. 2A:13-5; *H & H Ranch Homes v. Smith*, 54 N.J.

Super. 347, 352 (App. Div. 1959).   The plain language of N.J.S.A. 2A:13–5 grants a lien to an

attorney for "affirmatively pursuing his client's action, cause of action, claim or counterclaim or cross-claim." *Indus. Network Sys. v. Armstrong World Indus.*, 54 F.3d 150, 155 (3d Cir.1995) (internal quotations omitted).

In order for an attorney's charging lien to attach to the judgment or proceeds, attorneys must follow the procedures outlined in the case of *H & H Ranch*. The procedure in *H & H Ranch* requires an attorney to make an application by way of petition to the court in which she is appearing. 54 N.J. Super. 353-54. The petition must set forth the facts upon which the attorney relies on for determination of his or her alleged lien. *Id.* The New Jersey Supreme Court adopted the basic elements of the process articulated in *H & H Ranch*. *See Musikoff v. Jay Parrino's The Mint, L.L.C.*, 172 N.J. 133, 146 (2002).

No one disputed the Gorman Firm acquired an attorney's charging lien against the QSF Funds by timely filing a *Notice of Attorney Lien* in the Prudential Litigation. The Gorman Firm's lien was challenged in State Court, however, its adjudication was halted by the Debtor's bankruptcy filing. Consequently, the Gorman Firm entered the bankruptcy with an attorney's charging lien on the QSF Funds and, in turn, still has an attorney's charging lien today. *See Hoffman & Schreiber v. Medina*, 224 B.R. 556 (D. N.J .1998) (citing *Electronic Metal Prods. v. Bittman*, 916 F.2d 1502, 1504 (10th Cir.1990)) ("The validity and extent of an attorney's lien in bankruptcy is determined by state law"). For purposes of this settlement, there is no reason for this Court to adjudicate the merits of the charging lien. It is enough that one exists today. In evaluating the settlement, this Court must view the circumstances as they exist, balancing the *Martin* standards against the current state of affairs.

1.    Only the Gorman Firm holds an Attorney's Charging Lien on the QSF

Neither of the Law Firm Creditors nor Ms. Roper and Mr. Thyne appears to hold or has asserted it holds an attorney's charging lien on the QSF Funds.  The Bochetto Firm never asserted it holds an attorney's charging lien.  The Bendit Firm does not have a lien.  Judge Martinotti entered an Order on June 11, 2011, discharging the Bendit Firm's lien, leaving it solely with a claim for *quantum meruit*.

Skepnek & Smoot are also not on equal footing as the Gorman Firm.  As previously discussed, on September 29, 2016, this Court ruled that Skepnek & Smoot do not have a claim against the QSF Funds.  Without a claim against the QSF, the lien issue does not even arise.

Neither Ms. Roper nor Mr. Thyne, individually, stand on equal footing with the Gorman Firm because they have not demonstrated an attorney's charging lien on the QSF Funds.  Both Ms. Roper and Mr. Thyne filed individual *Proof of Claims* in the case.  Only Mr. Thyne asserted a claim against the QSF Funds.  Ms. Roper filed her claim against the Debtor for unpaid wages. (Proof of Claim No. 9).  Mr. Thyne's claim appears to have been filed on behalf of the Roper & Thyne Firm.  (Proof of Claim No. 11).  Mr. Thyne, however, never filed a *Notice of Attorney Lien* in the Prudential Litigation either for himself or the Roper & Thyne Firm.  Accordingly, neither appear to possess an attorney's charging lien on the QSF Funds.

2.    Immediate Distribution of QSF Funds

Ms. Roper and Mr. Thyne assert that, even if this Court found the value of the Gorman Settlement and Goldman Settlement appropriate under the *Martin* factors, state law prevents the immediate distribution of the QSF Funds.  This Court disagrees – the Gorman Firm's right to payment out of the QSF is superior to all the other parties.

Outside of the Gorman Firm, none of the parties hold an attorney's charging lien against the QSF. This brings up the issue of who has a superior claim and, therefore, a higher priority to payment. Specifically, the question arises as to whether an attorney with an attorney's charging lien has a superior right to payment versus an attorney without an attorney's charging lien. Upon examination by both the parties and the Court, there is no New Jersey court decision that provides guidance on how New Jersey state court would address this issue. As such, this appears to be an issue of first impression.

The Third Circuit has set out guidelines to be observed by lower courts in the Third Circuit when they are called upon to interpret the law of the states. The Third Circuit in *McKenna v. Ortho Pharmaceutical Corp.*, held that, in the absence of a State Supreme Court decision on an issue, the federal court "must consider relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand." 622 F.2d 657, 663 (3d Cir.), *cert. denied*, 449 U.S. 976, 101 S.Ct. 387 (1980); *Nationwide Mut. Ins. Co. v. Caris*, 170 F. Supp. 3d 740, 746 (D.N.J. 2016).

Bankruptcy Courts regularly evaluate and decide issues pertaining to the treatment of liens and lien holders and, therefore, the characteristics of this issue are very familiar to this Court. *See e.g.*, *In re Princeton Office Park, L.P.*, 423 B.R. 795 (Bankr. D.N.J. 2010) (deciding the first impression issue of whether a holder of a tax sale certificate and lien interest under New Jersey law equates to holding a "tax claim" under Section 511(a) of the Bankruptcy Code); *see also Batt v. Scully,* 168 B.R. 541, 545 (D.N.J. 1994) (deciding whether a real estate agent is entitled to an equitable lien on commissions received by the broker). In essence, this portion of the dispute is about distribution between a secured creditor and a number of unsecured creditors. In this respect,

36

New Jersey law generally provides secured creditors with superior rights to payment over unsecured creditors, if and when the property by which their claim is secured is liquidated.

For example, under New Jersey's adaptation of the Uniform Commercial Code, only perfected security interests holders share in the collateral, not unsecured creditors. *See* N.J.S.A. § 12A:9-322. In the real estate context, the creditors holding a perfected security interest in real property are paid after its disposition, and before any unsecured creditor could receive payment. *See New Brunswick Sav. Bank v. Markouski*, 123 N.J. 402 (1991) (observing the judgment creditor who levies and thereby perfects has priority over all nonlevying judgment creditors). Similarly, when a corporation dissolves and its assets are distributed or liquidated, secured claims are given priority over claims of general unsecured creditors. *See* N.J.S.A. § 14A:14-21. New Jersey's treatment of payment to secured creditors before unsecured creditors is also similar to the bankruptcy scheme set forth in Section 726 of the Bankruptcy Code. *See* 11 U.S.C. § 726.

State court claims with differing priorities do not share *pro rata*. Each class of claims only shares *pro rata* with others of the same class, and only when there are insufficient funds to pay each claim in full. Once a class is paid then the distribution cascades down to the next level. As mentioned, outside of the Gorman Firm, none of the Objecting Creditors hold an attorney's charging lien against the QSF. Therefore, none of the Objecting Creditors have the right to share *pro rata* with the Gorman Firm. As such, permitting immediate distribution of the QSF Funds does not conflict with state law.

*Martin v. Martin* is not applicable in this case. *Martin v. Martin* holds where there are successive or multiple attorneys involved in a single case and "[i]f it becomes necessary to allocate assets between or among attorneys who have otherwise established entitlement to a charging lien, then this must be done as equitably as possible." 335 N.J. Super. at 225. The *Martin v. Martin*

court held that in such circumstances no attorneys are entitled to a priority and instead, *pro rata*

distribution is appropriate. *Id.*  Here, the Gorman Firm holds an attorney's charging lien while the

remaining Objecting Creditors do not.  As such, *Martin v. Martin* does not apply.

**B.**   ***Martin* Factors**

1.   <u>The Probability of Success</u>

The probability of the Trustee's success in litigation against the Gorman Firm is not

perfectly clear as to all portions of its claim and cannot be decided without further dispositive

motions or an evidentiary hearing.  But, the Trustee believes the Gorman Firm possesses extensive

evidence to support its claim.  The Trustee attested to the volumes of evidence the he and his

counsel reviewed that supports the Gorman Firm's assertions.

Not only does the Gorman Firm allege that it holds a valid attorney's lien against the QSF

Funds, but it also contends that it holds a contractual claim against the Debtor by virtue of a

contractual agreement with the Debtor or, in the alternative, it holds a *quantum meruit* claim

against the Debtor, which exceeds the amount of its contractual claim.  In addition, the Gorman

Firm contends it is entitled to interest on account of its claim, as well as attorney's fees.  Here, the

Gorman Firm has multiple avenues of recovery open to it.  Certainly, the fact that no creditors in

the case objected to the amount of the Gorman Firm's claim is telling and supports the Trustee's

decision and the exercise of his business judgment.  There appears to be no question that the

Gorman Firm would be successful on some portion of its claim.

2.   <u>Difficulties of Collection</u>

Difficulties of collection are not a relevant factor to this case because the QSF Funds were

ordered to be turned over to the Trustee.  There is an available fund out of which to pay creditors.

3.    Complexity of Litigations and Expense

It is clear that litigation between the Trustee and the Gorman Firm would be complex and expensive.  This Court takes notice of the docket of this case both in the bankruptcy court and the State Court proceeding.  The Gorman Firm indicated to this Court that it is ready, willing and able to litigate if this settlement is not approved by this Court.  The Gorman Firm's readiness to litigate the amount/validity of its claim based on numerous legal theories discourages any notion that this case will be resolved by a simple motion alone.  Likewise, the numerous factual disputes, the number of parties involved and the animosity of the parties increase the probability that the litigation will be protracted and expensive.  This Court also relied upon the fact that in this case, numerous pleadings are routinely filed on every issue that has been brought before this Court. Therefore, the third *Martin* factor weighs in favor of approving the Gorman Settlement.

4.    Paramount Interest of the Creditors

The Gorman Settlement is in the best interest of all the creditors.  The Gorman Settlement reduces the total amount of claims against the estate by approximately $500,000 and prevents massive unnecessary spending on a litigation.  This helps all creditors.  Additionally, the Law Firm Creditors hold different levels of priority and the settlement has to be viewed from that perspective. In other words, there is a benefit and no prejudice to the other Law Firm Creditors because the Gorman Firm's interest is superior to theirs.  To hold otherwise would instead prejudice the Gorman Firm and be contrary to existing legal authority.

Additionally, contrary to the assertions made in the LaGrotta Letter, this Court finds that no plaintiffs from the Prudential Litigation will be prejudiced by the approval of Gorman Settlement.  The LaGrotta Letter made a number of allegations concerning the rights of the remaining unnamed plaintiffs from the Prudential Litigation.  The Court does not consider these

allegations credible and there is no record to support them.  Rather, the record supports the opposite.  As mentioned above, Ms. Roper, who serves as the QSF Trustee, expressly advised Judge Martinotti the "final distribution to a Prudential client was accomplished," and "there is no need for the continuation of the Qualified Settlement Fund Trust."  (Docket No. 77-2, Exhibit C).

### III.    *Goldman Settlement Motion Satisfies the Martin Standard*

#### A.    **The Probability of Success**

The probability of success in litigation is unclear while litigation will certainly be extremely costly and time-consuming.  It would be impractical to reason that litigating this claim would not cost the estate as much money in legal fees as it is attempting to preserve.  Here, none of the remaining objecting creditors object to the amount of the Goldman Settlement.  This Court views this as evidence supporting the settled amount.

Thus, the first *Martin* factor weighs in favor of approving the settlement.

#### B.    **Difficulties of Collection**

Difficulties of collection are not a relevant factor to this case because the QSF Funds were ordered to be turned over to the Trustee.  There is an available fund out of which to pay creditors.

#### C.    **Complexity of Litigations and Expense**

This Court takes notice of the docket of this case both in the bankruptcy court and the State Court proceeding, which leads the Court to infer that both expansive discovery and a multiday trial are foreseeable here.  There is a strong possibility that litigation would be expensive, especially in comparison to the minimal benefit that winning the litigation would bring to the estate.  In the hypothetical best case scenario for the estate, the Trustee wins the litigation against Goldman Firm and its $400,000 claim is expunged.  However, even in this hypothetical scenario, the estate will have to expend a substantial amount of money on legal fees.  The litigation costs alone may not be

far apart from the $180,000 settlement payment proposed today.  Therefore, the Court finds that

the third *Martin* factor weighs in favor of approving the settlement.

### D.     Paramount Interest of the Creditors

Paramount interest of the creditors is also furthered by this settlement.  The Court makes

no finding as to whether the Goldman Firm has any sort of lien against the QSF Funds.  Mainly,

because there is a disputed issue as to whether the Goldman Firm's informal correspondences

suffices to provide it with a lien.  Instead, this Court views the Goldman Firm's claim on the lowest

priority and still finds the settlement to be in the best interest of the estate.  Here, the Goldman

Settlement reduces the claim from $400,000 to $180,000, which is over a 50% reduction.  The

$180,000 amount is *de minimus* in light of other claims against the QSF Funds.  Further, the

Trustee could easily spend significant dollars litigating the Goldman Firm claim, which litigation

would include not only the amount of the claim but its priority as well.

Under the facts and circumstances of this case, this Court finds that the Trustee met the

*Martin* standards and will not disturb the Trustee's exercise of his business judgment.

### CONCLUSION

For the above reasons, the Gorman Settlement Motion and the Goldman Settlement Motion

are granted.  This Court will enter separate Orders in conformance with this decision.

Dated: November 4, 2016

*Stacey L. Meisel*
Honorable Stacey L. Meisel
United States Bankruptcy Judge